NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| _____ ) | |
| DANIEL KELLY, ) | Hon. Garrett E. Brown, Jr. |
| ) | |
| Plaintiff, ) | Civil Action No. 09-1274 |
| v. ) | |
| ) | **MEMORANDUM OPINION** |
| SIMON PROPERTY GROUP, INC., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**BROWN**, Chief Judge:

This matter[1] comes before the Court upon Defendant's motion for summary judgment. (Doc. No. 23.)  For the following reasons, the Court will grant in part Defendant's motion for summary judgment.

## I.    BACKGROUND

This employment law dispute presents the question of whether a two-year relocation agreement modified an employee's at-will employment status, so as to give rise to contractual or quasi-contractual liability for premature termination, despite the agreement's failure to conform with the at-will policy provided in the company's employee handbooks.  In discussing the relevant facts, the Court draws all reasonable inferences in favor of the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*A.  The Employee Handbooks*

Plaintiff Daniel Kelly, a New Jersey resident, was employed as an at-will employee by

_____

[1]This matter was reassigned to the undersigned by Order of March 15, 2010.

Chelsea Property Group, Inc. ("Chelsea") in 1993.  (Def.'s 56.1 Statement ¶ 1; Pl.'s 56.1 Resp.

¶ 1; Compl. ¶ 1.)  During the course of Kelly's employment, Chelsea issued employee handbooks

in 1995, 2003, and 2006 (generally "employee handbooks").  (Def.'s 56.1 Statement ¶ 2;

Duckstein Decl. Exs. A–C; Compl. ¶¶ 15–18; Pl.'s 56.1 Resp. ¶ 2.)  Although Simon Property

asserts, and Plaintiff's Complaint avers, that Chelsea also issued a third edition of the employee

handbook in 2006, Kelly claims that he does not recall receiving the 2006 handbook.  (Def.'s

56.1 Resp. ¶ 2; Compl. ¶ 17; Kelly Decl. ¶ 10.)

Yet, Plaintiff concedes that the employee handbooks contained an at-will employment

term stating "*Employment with the Company is voluntary and you are free to resign at any time,*

*with or without cause or notice.  Similarly, the Company may terminate your employment*

*relationship at will at any time, with or without notice or cause.*"[2]  (Duckstein Decl. Exs. A–C

(italics in original for Exs. B–C); Pl.'s 56.1 Resp. ¶ 3.)  The 2003 and 2006 editions of the

employee handbook further provided the following conditions for an alteration to the at-will

employment relationship:

> No statements made in pre-hire interviews or discussions, in these or
> other policies, or in recruiting materials of any kind may alter the at-will
> nature of employment or imply that discharge will occur only for cause.
> Moreover, no employee or officer of the Company other than the CEO
> has authority to enter into an oral or written agreement contrary to this
> policy of at-will employment and at-will discipline, transfer or demotion.
> Any such agreement made by the CEO (1) must be in writing, in the
> form of an integrated individual written contract of employment, (2) must
> be signed by both the CEO in his official capacity and by the employee,
> and (3) must expressly reference and state an intention to alter these at-
> will policies.

---

[2]Language quoted from 2003 and 2006 editions of the employee handbook.  A
substantively similar disclaimer appeared in the 1995 edition, but the 1995 version of this text
had slight variations in diction and was not set off in italics.  (Duckstein Decl. Ex. A.)

2

(Duckstein Decl. Exs. B–C.)  This disclaimer appears in the 2003 and 2006 editions of the employee handbook under the first substantive heading of the handbook, which states in all capital letters "THE NATURE OF EMPLOYMENT."  (*Id.*)  The at-will policy appearing in the 1995 edition of the employee handbook contained all but the last sentence of its successors (i.e., that a change to at-will status required an integrated contract, specifying change to at-will status, signed by the CEO), but it appeared under the same prominent heading.  (*Id.* Ex. A.)  Kelly further admits that he signed acknowledgment forms upon receiving the 1995 and 2003 employee handbooks that recognized he was an at-will employee.  (*See* Def.'s 56.1 Statement ¶ 5; Duckstein Decl. Exs. D–E; Pl.'s 56.1 Resp. ¶ 5.)  These forms, which Plaintiff signed, expressly state:

> I further understand that [Chelsea] may modify this handbook or change or rescind any policies . . . at any time in its sole and absolute discretion, without prior notice with the exception of the at-will policy, which can be altered, amended, modified or changed only if done in writing that expressly references and states an intention to alter these at will policies, and is signed by the Chief Executive Officer of the Company in his official capacity.

> I have entered into my employment relationship with [Chelsea] voluntarily and acknowledge that my length of employment is for no specified time period.  Accordingly, either I or [Chelsea], can terminate the relationship at will, with or without cause, at any time, with or without notice.

(Duckstein Decl. Ex. D–E.[3])  Despite these handbook provisions and acknowledgment forms, Plaintiff states that he "do[es] not recall ever becoming aware of any particular procedure for

---

[3]Language quoted from the 2003 acknowledgment form, which Plaintiff appears to have signed on February 2, 2004.  (Duckstein Decl. Ex. E.)  The 1995 acknowledgment form contained a substantively similar disclaimer, but, among other minor differences, the term "Chief Executive Officer" in the final line of the first paragraph is set off by italics, so that the paragraph concludes: "only if done in writing and signed by the *Chief Executive Officer* of the Company in his official capacity."  (Duckstein Decl. Ex. D.)

modifying at-will status at Chelsea."  (Kelly Decl. ¶ 9.)

     *B.  The Relocation Agreement*

     In or about February 2008, Chelsea President Michael Clarke asked Kelly to relocate from New Jersey to the company's Hong Kong office.  (Def.'s 56.1 Statement ¶ 11; Pl.'s 56.1 Resp. ¶ 11.)  The record reflects that Kelly engaged in a series of negotiations with Clarke between March and May 2008, which included in-person meetings on March 6 and April 1, that discussed such items as compensation, relocation expenses, and the length of the relocation assignment.  According to Plaintiff, he and Clarke "agreed that the minimum term of [his] employment in Hong Kong would be two years," and this employment term "remained a cornerstone of the deal throughout negotiations."  (Kelly Decl. ¶¶ 21, 22.)  Kelly further states "[a]s a corollary to this, Mr. Clarke was clear that upon the expiration of the two years there would be no guarantee that there would be a position for [Plaintiff] with [Chelsea] in New Jersey or anywhere else."  (*Id.* ¶ 23.)

     Kelly also states that the negotiations involved discussions regarding the amount of Long-Term Executive Incentive Plan (LTIP) units he would receive as a result of the relocation.  The parties dispute how many LTIP units had vested and how many LTIP units Plaintiff was eligible for prior to the relocation, but the record suggests that the negotiations concerned increasing the number of vested and potential LTIP units to 2,400 and 4,000 units, respectively.  (*See id.* ¶¶ 27–29, 33–34.)  Kelly notes that he was informed at various times that his LTIP demands and other terms of the proposed relocation needed to be approved by Chelsea CEO Les Chao.  (*Id.* ¶¶ 29, 34, 36–39.)

     On or about May 23, 2008, Chelsea Vice President of Human Resources Christina Casey presented Plaintiff with a proposed letter agreement concerning the terms of Plaintiff's relocation

to Hong Kong.  (*Id.* ¶ 38.)  After further negotiations and modifications to the proposal, Plaintiff received an offer letter, signed by Ms. Casey, setting forth the terms of his relocation.  (Duckstein Decl. Ex. H (hereinafter "relocation agreement").)  Plaintiff countersigned the offer letter on May 29, 2008, indicating that he "accept[ed] the terms of th[e] relocation."  (*Id.*)  The finalized relocation agreement provided the following terms:

| | |
|---|---|
| Title: | No change – Vice President – International Leasing |
| Period of Assignment: | Minimum of two years; by mutual agreement thereafter |
| Relocation Date: | Week of August 4th, 2008 |
| Salary: | US$225,000 per annum (begins first payroll after move) |
| Bonus: | Annual bonus based on individual and company performance, up to a maximum of 90% of salary (effective for calendar year 2008 bonus paid in March 2009.) |
| Units: | Granted 900 additional units – from 1,500 units to 2,400.  Based on performance, the number of units may increase from 2,400 to 4,000. |
| Housing: | HK$115,000 per month for duration of assignment. As requested, Chelsea will pay rent directly to landlord.  Lease stipulates that "Tenant and Landlord have the mutual option to terminate the Tenancy Agreement after 12 months by serving a 2 month's prior written notice to the other party, the <u>minimum</u> of the lease is 14 months."  If you should voluntarily terminate your employment prior to July 1, 2009, you will be responsible for reimbursing Chelsea 50% of any rent due between your termination date and June 30th 2009, plus an additional two months.  (In other words, Company will split the difference.) |

5

| | |
|---|---|
| Relocation: | US$25,000; three roundtrip business class tickets each year; and tax equalization.  Tax return preparation by Ernst and Young will be paid for by Chelsea.  At your cost, your accountant will review and approve the return prepared by E&Y. |
| Benefits: | All benefits consistent with Chelsea Property Group programs, including CIGNA International Medical Plan, 401K Plan, Life Insurance & AD&D, Company-paid Short-term and Long-term Disability Insurance. |

(*Id.*)  The record reflects that Chelsea's CEO never signed the relocation agreement.  Pursuant to the relocation agreement, Kelly moved to Hong Kong and began work at the Hong Kong office in August 2008.  (Def.'s 56.1 Statement ¶ 18; Pl.'s 56.1 Resp. ¶ 18.)

   *C.  The Termination & Plaintiff's Complaint*

   Approximately four months later, Chelsea terminated Kelly's employment, effective January 2, 2009.  (Def.'s 56.1 Statement ¶ 19; Pl.'s 56.1 Resp. ¶ 19.)  On March 20, 2009, Plaintiff filed a four-count Complaint against Simon Property alleging breach of contract, breach of the covenant of good faith and fair dealing, and promissory estoppel.  According to the pleadings, Simon Property acquired Chelsea in or about 2004 and absorbed Chelsea in or about 2006.  (Compl. ¶¶ 4–5; Answer ¶¶ 4–5.)  At the time of the relocation negotiations, Plaintiff avers that Chelsea was a division of Simon headquartered in New Jersey.  (Compl. ¶ 5.)  Although the Complaint does not specify the exact damages Plaintiff seeks, the Court understands Plaintiff to assert the following damages pursuant to the relocation agreement: the remainder of the two-year relocation salary; the remainder of the two-year flight allocation; the remainder of the two-year medical, disability, and retirement benefits; the remainder of the two-year housing allocation; the remainder of LTIP units promised; and unpaid bonuses.  (*See* Compl. ¶ 43.)  Simon Property now moves for summary judgment on all claims, but it only challenges

Plaintiff's LTIP claim to the extent that Plaintiff seeks the 1,600 LTIP units he was eligible to receive during his employment in Hong Kong pursuant to the relocation agreement.  (*See* Def.'s Reply Br. at 9 (withdrawing motion in part).)

## II.    ANALYSIS

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hersh v. Allen Prods. Co.*, 789 F.2d 230, 232 (3d Cir. 1986).  The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (noting that no triable issue exists unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict in its favor).  In deciding whether triable issues of fact exist, this Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party.  *Matsushita*, 475 U.S. at 587; *Pa. Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995); *Hancock Indus. v. Schaeffer*, 811 F.2d 225, 231 (3d Cir. 1987).  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a), because the matter involves diverse citizens,[4] and the controversy exceeds $75,000.

Simon Property argues that Plaintiff's contract claims and promissory estoppel claim are

---

[4]The Court notes that, according to the Complaint, Chelsea was at one point a distinct Delaware corporation that had a principal place of business in New Jersey.  (Compl. ¶ 4.) However, Plaintiff's Complaint only names Simon Property as a Defendant, and the parties do not dispute that Simon Property's citizenship (Delaware and Indiana) is diverse from Plaintiff's citizenship (New Jersey).  (*Compare* Compl. ¶¶ 1–2 *with* Answer ¶¶ 1–2.)  Neither party suggests that Chelsea is the alter ego of Simon Property, such that's Chelsea's citizenship characteristics would attach to Simon Property.  Accordingly, this Court sees no impediment to the exercise of diversity jurisdiction.

foreclosed by the at-will policy provided in the employee handbooks, which provided the precise procedure for modifying an employee's at-will status.  In the absence of a valid contract, Simon Property argues that Plaintiff may not bring a claim for breach of the covenant of good faith and fair dealing.  Finally, Simon Property argues that the remaining 1,600 unvested LTIP units sought by Plaintiff pursuant to the relocation agreement (from 2,400 units to 4,000 units) are barred by the plain terms of the relocation agreement and the undisputed record.  Plaintiff responds that the employee handbooks' at-will policies are not enforceable for a number of reasons, or alternatively that the relocation agreement constitutes an enforceable collateral agreement, whether under contract principles or promissory estoppel.  With regard to the LTIP units, Plaintiff argues that he has presented evidence creating a question of fact regarding the distribution of the challenged LTIP units.[5]  The Court considers each argument in turn.

   *A.  Plaintiff's Employment Status*

   In New Jersey, it is well established that the employment relationship "remains terminable at the will of either an employer or employee, unless an agreement exists that provides otherwise."  *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397 (1994).  Under the employment at-will doctrine, "an employer may fire an employee for good reason, bad reason, or no reason at all . . . ."  *Witkowski*, 136 N.J. at 397.  The New Jersey Supreme Court recognized in *Woolley v. Hoffman-La Roche, Inc.* that prominent employment policies appearing in widely circulated employment manuals are enforceable against the employer.  99 N.J. 284, 297–98 (1985) ("[W]hen an employer of a substantial number of employees circulates a manual that,

---

   [5]Because Simon Property withdrew part of its challenge to Plaintiff's LTIP-unit claim in its reply brief, the Court need not consider the parties' arguments regarding the other LTIP units at this time.

when fairly read, provides that certain benefits are an incident of the employment (including, especially, job security provisions), the judiciary . . . should construe them in accordance with the reasonable expectations of the employees.").  The question in this case is whether a prominent employment policy appearing in a widely circulated employee handbook is similarly enforceable against the employee.

Simon Property relies on the decision of the Appellate Division in *Mita v. Chubb Computer Services, Inc.*, 337 N.J. Super. 517 (App. Div. 2001) to argue that the employee handbooks' at-will policy is enforceable and forecloses Plaintiff's claims on the basis of the relocation agreement.  The Court agrees that *Mita* is applicable, but the Court disagrees to the extent that Simon Property argues that *Mita* disposes of Plaintiff's claims in their entirety.

*Mita* involved a former employee's wrongful termination suit against an employer that terminated her for failure to sign a non-compete agreement.  The plaintiff in *Mita* argued that a 1995 agreement prepared by her supervisor had modified her at-will status prior to her termination, because she agreed to accept a reduction in commissions in exchange for declining to comply with the company's request that she sign a non-compete agreement.  As with this case, the employer in *Mita* relied on an employee handbook's at-will policy, which stated that the employee's at-will status could only be changed under specific circumstances.  The handbook provision in *Mita* provided that

> an employee's at-will status could be changed only by written documentation which: (1) was signed by Chubb Computer Services' President and the individual employee, (2) specifically named the individual employee, (3) expressly stated that the named employee was not employed at-will, and (4) set forth the specific duration and terms of the individual's employment . . . .

337 N.J. Super. at 521.

The *Mita* court held that the employee handbook at-will-modification provision was enforceable against the employee "[w]here [the] employee manual clearly and unequivocally provides the exclusive means by which an employment-at-will relationship can be altered." *Id.* at 527.  The *Mita* court described its ruling as a "corollary" to the unilateral contract theory endorsed by the New Jersey Supreme Court in *Woolley*, 99 N.J. at 297–300, stating that "[i]n this context . . . the employee manual sets forth the conditions for employment. The employee, by continuing to work, accepts the employer's offer and the requisite conditions of employment." *Mita*, 337 N.J. Super. at 527.  The *Mita* court limited its ruling to situations where the employee "was aware of the manual and . . . continued to work intending that continuation to be the action in exchange for the employer's promise." *Id.*  Towards this end, the court instructed courts to consider the prominence of the employee handbook at-will-modification provision, as demonstrated by its typeface, heading, and the degree to which it was separated from other terms in the handbook.  *Id.* at 527–28 (collecting cases).  Applying these principles, the *Mita* court found that the 1995 memorandum did not alter the plaintiff's at-will status, notwithstanding the signature of the employer's CEO, because it did not comply with the other requirements of the handbook's at-will-modification provision—express statement of duration, terms of employment, and that the plaintiff was no longer an at-will employee.  *Id.* at 528.  Further, although the *Mita* court suggested that "there might be situations in which enforcement of such a provision would be unconscionable," or where "the employer's conduct in conveying a promise of job security to forestall an employee's resignation may be so egregious as to require application of the doctrine of promissory estoppel notwithstanding the disclaimer in an employee manual," the *Mita* court did not find these doctrines applicable to the plaintiff's claims in that case.  *Id.* at 528–29 (noting that "the memorandum does not support plaintiff's claim of a

10

promise on [the employer's] part never to fire her for refusing to sign a non-compete agreement," that "[t]he agreement does not say that plaintiff will not be terminated in the future for refusal to sign an agreement not to compete," and that "Plaintiff's continued refusal to sign a non-compete agreement evidenced her desire to maintain her at-will status").

Plaintiff argues that *Mita* is distinguishable for the following reasons: (1) the handbook provisions in this case were not sufficiently prominent to be enforceable; (2) there is an issue of fact regarding whether Plaintiff received and acknowledged the 2006 employee handbook; (3) the relocation agreement substantially complies with the at-will modification procedure outlined in the employee handbooks; and (4) that enforcement of this handbook provision would be unconscionable. Plaintiff's arguments in this regard present distinctions without a meaningful difference. With regard to Plaintiff's argument that he did not receive the 2006 handbook, Plaintiff overlooks the fact that he admits he received the 1995 and 2003 handbooks, both of which prominently specified his at-will status, and signed acknowledgment forms related to these handbooks that indicated both that he was an at-will employee and that Chelsea could not change the company's at-will policy without a writing signed by the company's CEO. (*See* Def.'s 56.1 Statement ¶ 5; Duckstein Decl. Exs. D–E; Pl.'s 56.1 Resp. ¶ 5.) Although Plaintiff disputes receiving the 2006 edition, the record reflects that the 2006 edition did not change the relevant handbook provision that limited the means by which an employee's at-will status could be modified. (*Compare* Duckstein Decl. Ex. B *with* Ex. C.) Plaintiff also argues that Chelsea's 2004 merger with Simon Property cast doubt on the applicability of the handbook provisions, but this argument is belied by the fact that Plaintiff negotiated his relocation in good faith with Chelsea officers, never once expressing concern that these officers lacked authority to approve his relocation. (*See* Kelly Decl. ¶¶ 21–39.) The touchstone for the *Woolley* doctrine and its *Mita*

11

corollary is the "reasonable expectations of the employees." *See Woolley*, 99 N.J. at 298; *Mita*, 337 N.J. Super. at 527–28.  At the time of his relocation, Plaintiff did not have reason to believe that the Chelsea employee handbooks were no longer applicable due to Chelsea's merger with Simon Property.  Furthermore, Plaintiff concedes in his Complaint that Chelsea reissued the employee handbook in 2006, after its alleged merger with Simon Property, and the record reflects that this edition of the handbook contained the same at-will modification provision.[6]  (*See* Compl. ¶ 17; Duckstein Decl. Ex. C.)  The Court fails to see how a handbook that Plaintiff did not receive could change the parties' expectations regarding the at-will policy most recently stated in the 2003 edition of the handbook, when the handbook that Plaintiff did not receive did not change the at-will policy.

Turning next to Plaintiff's argument that the at-will provisions in the 2003 handbook were not sufficiently prominent to be enforceable under *Mita*, or in the alternative that the matter presented an issue of fact, the New Jersey Supreme Court has indicated that courts may determine disclaimer prominence, for purposes of enforcing employee handbook provisions, as a matter of law "when the facts surrounding the content and placement of a disclaimer are themselves clear and uncontroverted." *Nicosia v. Wakefern Food Corp.*, 136 N.J. 401, 416 (1994).  As noted above, the guidepost for this determination is the "reasonable expectations of the employees." *See Woolley*, 99 N.J. at 298.  Here, the Court is satisfied that the facts concerning the content and placement of the handbooks' at-will provisions are sufficiently clear to determine the issue of prominence as a matter of law.  The at-will policies in the 1995 and 2003 handbooks were prominently displayed as the handbook's first

---

[6]The issues presented in this case do not call upon the Court to consider whether Chelsea continued to operate as a distinct corporate entity after its alleged merger with Simon Property.

substantive item (item no. 100), beneath all-capital-letter headings "THE NATURE OF EMPLOYMENT," with the basic description of the at-will policy appearing in italics. (Duckstein Decl. Exs. A–B.)  Although the at-will modification provision was not displayed in a particularly distinctive manner when it was added to "THE NATURE OF EMPLOYMENT" section of the 2003 edition of the handbook, that handbook's at-will provision was sufficiently prominent to alert Plaintiff that he was an at-will employee.  Considering that Plaintiff twice signed acknowledgment forms in 1995 and 2004 recognizing that he was an at-will employee, and that the company's at-will policy could not be changed absent a writing from the company's CEO (Duckstein Decl. Exs. D–E), this Court cannot accept Plaintiff's argument that these disclaimers were not sufficiently prominent to notify employees that a change to at-will employment required a writing signed by Chelsea's CEO.  *See Worbetz v. Ward N. Am. Inc.*, 54 F. App'x 526, 532 (3d Cir. 2002) (rejecting employee's contention that the at-will policy appearing in his employment "Statement of Understanding" was too inconspicuous to be legally enforceable where the employee had signed an acknowledgment form, in conjunction with receiving his employee handbook, that stated he understood that he was an at-will employee and "that no manager or any other employee of the Company is authorized to make any representation [contrary to the company's at-will policy], unless it is expressed in an individual written employment contract signed by the President/CEO of the Company").

Turning to Plaintiff's substantial compliance and unconscionability arguments, Plaintiff relies on the terms set forth in the relocation agreement, as well as his declaration statements regarding the participation of Chelsea's CEO during the negotiation process.  Plaintiff specifically notes the importance of the two-year term provision during the course of the negotiations, and points out that Chelsea's CEO was consulted and approved certain of Plaintiff's

negotiation requests.  (*See* Kelly Decl. ¶¶ 21–22, 29, 34, 36–39.)  Plaintiff also notes the fundamental unfairness of enforcing a handbook provision he claims to have last seen five years prior to his relocation.[7]  These arguments are not persuasive, because the relocation agreement in this case does not appear to comply with the applicable handbook provision any more than the memorandum agreement complied with the handbook provision in *Mita*, and the Court cannot say that the employer's conduct in this case was especially egregious compared to the employer's conduct in *Mita*.  With regard to compliance with the applicable handbook provisions, although it appears that the memorandum in *Mita* lacked language discussing the duration and terms of employment—items that are discussed in some form in Plaintiff's relocation agreement—it *was* signed by the company's CEO.  *See Mita*, 337 N.J. Super. at 528.  Plaintiff's relocation agreement was not.  The two-year term provision relied on by Plaintiff indicates that Plaintiff's "Period of Assignment" would be "[m]inimum of two years; by mutual agreement thereafter." (Duckstein Decl. Ex. H.)  Like the memorandum in *Mita*, neither this term, nor any other term in Plaintiff's relocation agreement, contained express language indicating that he could only be fired for cause, or that he was no longer an at-will employee. *See Mita*, 337 N.J. Super. at 528. These omissions demonstrate that Plaintiff's relocation agreement did not comply with the at-will modification provision in the 2003 handbook.  To the extent that Plaintiff argues that the handbook provisions were too remote to be enforceable, and presuming Plaintiff did not receive the 2006 edition of the handbook, the Court notes that the handbook and acknowledgment form

---

[7]Plaintiff argues that he last saw the 2003 handbook five years prior to his relocation in August of 2008, but the Court notes that the signed acknowledgment form indicates that it was signed on February 2, 2004.  *See supra* note 3.  For purposes of the present motion, the Court draws this inference in favor of Plaintiff and accepts Plaintiff's claim that he had not seen the handbook for five years.

enforced in *Mita* appear to have been similarly remote in time.  *See Mita*, 337 N.J. Super. at 520–23 (indicating that the employee received the handbook and signed the acknowledgment form when she began her employment in 1990, that the at-will modification provision appeared in the amended handbook in 1995, and that the employee was terminated in 1997).  As for the conduct of Plaintiff's employer, Plaintiff admits that, during the course of his negotiation, his employer informed him that he may not have a job in New Jersey upon the completion of the Hong Kong assignment.  (Kelly Decl. ¶ 23.)  Moreover, a superficial review of the relocation agreement reveals that his employer offered valuable consideration in return for him accepting the Hong Kong assignment, in the form of a salary increase, a bonus payment of $25,000, travel and housing allowances, and additional LTIP units.  By comparison, the employer in *Mita* agreed to permit the employee to continue working without signing a non-compete agreement in exchange for a 15% reduction in commissions, only to turn around two years later and terminate the employee for failure to sign a non-compete agreement.  *See Mita*, 337 N.J. Super. at 522–24. The *Mita* court did not find this conduct especially egregious to warrant nullifying the handbook provision in that case.  *See id.* at 528–29.  While the Court recognizes that the circumstances of Plaintiff's termination in this case are rather unfortunate, this Court does not find Chelsea's conduct in this case especially egregious, so as to justify disregarding the employee handbook's at-will policy.

Applying the principles set forth in *Mita*, this Court finds that the relocation agreement did not alter Plaintiff's at-will employment status, because it did not comply with either the procedure set forth in the 2003 handbook or the disclaimer appearing on the 2004 acknowledgment form.  This Court further finds that Plaintiff may not pursue damages incident to his continued employment for the two-year term of the relocation agreement via promissory

estoppel or the implied covenant of good faith and fair dealing.  In New Jersey, promissory

estoppel consists of: "(1) a clear and definite promise by the promisor; (2) the promise must be

made with the expectation that the promisee will rely thereon; (3) the promisee must in fact

reasonably rely on the promise[;] and (4) detriment of a definite and substantial nature must be

incurred in reliance on the promise."  *Malaker Corp. Stockholders Protective Comm. v. First

Jersey Nat'l Bank*, 163 N.J. Super. 463, 479 (App. Div. 1978); *see also Peck v. Imedia, Inc.*,

293 N.J. Super. 151, 165 (App. Div. 1996); *Watson v. City of Salem*, 934 F. Supp. 643, 661

(D.N.J. 1995).  Plaintiff has not submitted colorable evidence that Chelsea made a clear and

definite promise that he would not be terminated without cause, or otherwise indicating that he

was no longer an at-will employee.  As noted above, the relocation agreement does not contain

such a representation.  *Cf. Mita*, 337 N.J. Super. at 529 ("[The memorandum agreement] does not

support plaintiff's claim of a promise on [the employer's] part never to fire her for refusing to

sign a non-compete agreement. The agreement does not say that plaintiff will not be terminated

in the future for refusal to sign an agreement not to compete. [The employer] never promised that

it would not pursue the [non-compete agreement] matter in the future.  Nor does the parties'

conduct suggest such an agreement." ).  Furthermore, in light of the prominent at-will policies

appearing in the employee handbooks and on the acknowledgment forms Plaintiff signed, this

Court could not say that reliance on such a promise, had one been made, would be reasonable.

*See Worbetz*, 54 F. App'x at 532 ("Because [the employee] agreed to be employed 'at will' in

documents he signed before and during the course of his employment, he cannot show reasonable

reliance on a promise of employment on a commission basis for a two year term.").  Accordingly,

to the extent that Plaintiff seeks damages incident to his continued employment for the two-year

term of the relocation agreement, this Court will grant Simon Property's motion for summary

judgment on Plaintiff's contract, promissory estoppel, and implied covenant claims.

However, to the extent that Plaintiff seeks damages incident to relocation benefits and the work he completed under the relocation agreement, the Court is inclined to permit this portion of Plaintiff's claims to go forward.  Although this Court finds that, courtesy of the prominent at-will policies appearing in the employee handbook provisions and acknowledgment forms, the relocation agreement did not alter Plaintiff's at-will employment status, Simon Property has not presented evidence that the employee handbooks prevented Chelsea from making other agreements with its employees that do not affect their at-will status.  Indeed, it appears from both the employee handbooks and Plaintiff's acknowledgment forms that Chelsea retained broad discretion to modify other company policies and conditions of employment, with the exception of agreements that would modify an employee's at-will status.  (*See, e.g.*, Duckstein Decl. Ex. B ("[C]hanges in terms of employment may be made by the Company at any time, with or without cause and with or without advance notice."), Ex. E (same).)  The parties' arguments regarding the additional LTIP units awarded by the relocation agreement, discussed *infra*, reflects that the relocation agreement may be enforceable as a collateral agreement even if it does not alter Plaintiff's at-will status.  The question remains, though, exactly which damages Plaintiff may seek under the relocation agreement.

By virtue of this Court's ruling regarding Plaintiff's employment status, Plaintiff certainly cannot seek salary or benefits incident to continued employment for the work he did not complete, because he was an at-will employee.  However, for the time he worked, Plaintiff may seek non-discretionary benefits incident to his relocation and employment during the Hong Kong assignment, such as unpaid housing allowances, airfare, and tax equalization.  By completing such work, Plaintiff may be found to have completed conditions precedent under the relocation

agreement that would entitle him to certain benefits, or conversely he may be found to have reasonably relied to his detriment upon certain terms of the relocation agreement. Because the parties did not fully address this damages dichotomy in their briefs, and because it appears that certain relocation terms have been satisfied and others not, the Court will not attempt to divine a definitive list of damages that Plaintiff may seek under the relocation agreement. For present purposes, the Court will deny Simon Property's motion for summary judgment on Plaintiff's claims to the extent that Plaintiff seeks damages incident to relocation benefits and the work he completed pursuant to the relocation agreement.

B. *1,600 Additional LTIP Units*

With regard to the 1,600 additional LTIP units contemplated by the relocation agreement, the Court agrees with Simon Property that the plain terms of the relocation agreement and the undisputed record prevent Plaintiff from seeking these LTIP units. It is undisputed that the LTIP portion of the relocation agreement provided that, "[b]ased on performance, the number of units may increase from 2,400 to 4,000." (Duckstein Decl. Ex. H.) The permissive language used in this term of the relocation agreement—that the units *may* increase—does not obligate the employer to grant the contemplated additional LTIP units upon Plaintiff's satisfaction of a condition precedent; rather, this language suggests that the employer retained discretion in awarding additional LTIP units. However, even if the LTIP provision's reference to "performance" referred to an objective standard of the completion of Plaintiff's assignment,[8] so as to provide a condition precedent obligating the employer to distribute LTIP units, there is no

---

[8]The Court notes that the more natural reading of the relocation term is that the employer might award additional LTIP units on the basis of its subjective evaluation of Plaintiff's on-the-job performance.

dispute that Plaintiff did not complete the performance of his assignment.  Plaintiff does not

dispute that he ceased performance of his duties when Chelsea terminated him effective January

2, 2009.

Plaintiff responds that he has presented evidence, in the form of statements made by

Chelsea's president during the course of the parties' negotiations (hereinafter "negotiation

statements"), that presents an issue of fact regarding whether he was entitled to the additional

1,600 LTIP units.  (Pl.'s Br. at 23.)  According to Plaintiff's declaration, Mr. Clarke responded to

Plaintiff's LTIP negotiation position, which requested 4,000 total LTIP units instead of the 2,400

then proposed by Chelsea, by stating that "[other] additional units would be granted immediately

but the additional 1,600 LTIP units could not be granted outright as of the time of the move and

would need to be earned in 20% increments over the remaining two-years [sic] of the LTIP."

(Kelly Decl. ¶ 35.)  In addition to his account of the above conversation, Plaintiff relies on Mr.

Clarke's April 2, 2008 email, which asks Plaintiff to "[p]lease understand that the target 4,000

units is all but guaranteed as long as you perform your job."  (Kelly Decl. Ex. I.)  Plaintiff does

not suggest that these conditional negotiation statements, which occurred prior to the completion

of the relocation agreement, established a contractual entitlement to the additional LTIP units.[9]

Thus, the question before the Court is whether Plaintiff may pursue these LTIP units under his

promissory estoppel claim.

As noted above, promissory estoppel consists of: "(1) a clear and definite promise by the

---

[9]Indeed, if these negotiation statements may be construed as offers, Plaintiff does not
suggest that he accepted these offers, or any other LTIP-unit offer, prior to signing the relocation
agreement.  To the extent that Plaintiff seeks to rely on these statements as parol evidence
concerning the meaning of the relocation agreement's LTIP-unit term, the vague and conditional
language in the negotiation statements do not breathe new life into the discretionary language of
the LTIP-unit term.

promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise[;] and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise." *Malaker*, 163 N.J. Super. at 479. This Court finds that the negotiation statements relied on by Plaintiff do not establish a clear and definite promise.  At most, the conditional language in the negotiation statements indicate that "the additional 1,600 LTIP units could not be granted outright," but suggest that Plaintiff "would need to . . . earn[]" the LTIP units by "perform[ing]" his job.  This sort of vague assurance, which suggests that Plaintiff *could earn* additional LTIP units, does not constitute an actionable promise that Plaintiff *would receive* additional LTIP units.

Furthermore, it is undisputed that Plaintiff's performance ceased upon his termination January 2, 2009.  Plaintiff does not suggest that he was deprived of the initial opportunity to earn additional LTIP units under the relocation agreement, but only argues that he was deprived of a continuing opportunity to earn the same.  As the Court explained above, the relocation agreement did not alter Plaintiff's at-will status, and Chelsea was not obligated to permit Plaintiff to complete the remainder of his two-year assignment.  The parties' course of conduct does not establish a clear and definite promise that Plaintiff would receive the 1,600 additional LTIP units.  Thus, Plaintiff has not demonstrated reasonable reliance to his detriment upon a promise of additional LTIP units.

For these reasons, Plaintiff has not presented evidence demonstrating a genuine issue that he was entitled to the additional 1,600 LTIP units, under either a contract or promissory estoppel theory of liability.  The Court will therefore grant Simon Property's motion for summary judgment with regard to the 1,600 additional LTIP units contemplated in the relocation

20

agreement.[10]

## III.   CONCLUSION

For the aforementioned reasons, the Court will grant in part Defendant's motion for summary judgment (Doc. No. 23) against Plaintiff.  An appropriate form of order accompanies this Memorandum Opinion.

Dated: October 21, 2010

_____/s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.

---

[10]The Court notes that, by letter of July 27, 2010, Plaintiff objected to certain statements made in the supplemental declaration of defense counsel.  However, the Court need not rely on the information in the supplemental declaration, submitted in support of Simon Property's Reply Brief, in order to resolve the issues before the Court.